**Gregory L. HARPER, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Nos. 2009–CA–002390–MR, 2010–CA–001802–MR.

Court of Appeals of Kentucky.

Nov. 4, 2011.

Discretionary Review Denied by Supreme Court Aug. 15, 2012.

Bruce P. Hackett, Louisville, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Susan Roncarti Lenz, Assistant Attorney General, Frankfort, KY, for appellee.

Before CAPERTON, NICKELL, and WINE, Judges.

*OPINION*

CAPERTON, Judge:

Following a jury conviction for second-degree assault and first-degree unlawful imprisonment, the Appellant Gregory Harper was sentenced to eight years of imprisonment.[1] He now appeals the August 10, 2010, order of the Jefferson Circuit Court denying his motion for a new trial based upon the failure of the courtroom recording equipment to produce a record of his

---

1. This case has been consolidated with Harper's direct appeal (No. 2009–CA–002390–MR) from the same case (Indictment No. 09–CR–0951), which is also currently pending before this Court.

jury trial. Following a review of the record, the arguments of the parties, and the applicable law, we affirm.

On March 30, 2009, Harper was indicted for the February 14, 2009, second-degree assault and first-degree unlawful imprisonment of his niece, Charisse Harper. Subsequently, due to failure of the courtroom recording equipment, the trial court entered a summary of the trial proceedings and, therefore, all references *infra* to testimony and events at trial are according to the trial summary.

According to the trial summary, on February 14, 2009, Charisse Harper was living with Gregory Harper. At the time of trial, she was 37 years old, and Gregory was 51. Apparently, Charisse and Gregory were engaged in an altercation,[2] and, according to Charisse, Gregory locked her out of the house. Charisse testified that she attempted to gain entry through a kitchen window, at which time Gregory grabbed her, pulled her inside, pinned her to the ground, and beat her, refusing to relent until she promised she would not call the police.

During the course of her testimony, Charisse displayed her scars to the jury and explained that she went feet first through the kitchen window, which she stated was about two feet above the stove. Charisse testified that Gregory grabbed her by the legs and pulled her into the kitchen and that she believed that was when she bruised her leg. Charisse testified that her face never hit the stove. Charisse testified that she then left, went across the street to a friend's house, and called 911. Although initially refusing to go to the emergency room, Charisse was persuaded to do so after passing out later in the evening. After leaving the hospital, Charisse reported Gregory's actions to the police.

De'Shawna McGowan also testified below. McGowan lived across the street from Charisse and testified that Charisse initially came over to her house on the evening of the assault because her uncle would not allow her to use the phone. McGowan testified that Charisse took a cordless phone and went back across the street. Approximately ten minutes later, McGowan went to look for the phone and found it on Charisse's front porch. McGowan testified that she heard a loud male voice arguing and went back to her house. McGowan testified that a couple of minutes later, Charisse returned to her house and asked for the phone to call the police. McGowan testified that Charisse's eye was split and purple, and that her lip was bleeding. McGowan spent additional time that evening with Charisse and her boyfriend, Edward Bibb, and testified that she noticed bruises forming on Charisse, as well as an increase in the swelling of her left eye and lip.

Charisse's boyfriend, Edward Bibb, also testified below. Bibb testified that when he arrived at the scene, Charisse was "in bad shape." He felt that she needed medical care, although she seemed to want to wait. Bibb testified that Charisse was drinking following the assault, and that after she passed out, he took her to University of Louisville Hospital, where she remained for four days. Bibb identified Gregory in court on the day of his testimony.

Dr. Barbara Casper, who treated Charisse at the hospital, also testified below. Casper testified that the primary reason Charisse was admitted to her care was for

2. Charisse asserts that this altercation was over a phone, but Gregory denies that this is the case.

severe and chronic anemia secondary to heavy menstrual flow, Although Dr. Carper identified the heavy menstrual flow as a cause of the anemia itself, she testified that Charisse would, nevertheless, have had to go to the hospital that evening because of the injuries inflicted during the course of the beating itself.

Upon admission, Charisse's symptoms were headache, transient loss of consciousness, and pain in the abdomen, face, and legs. Dr. Casper testified that Charisse's left eye was swollen shut. The CT scan showed no internal injuries, although Charisse did have a broken nose, significant bruising on her limbs, and a tender abdomen. Dr. Casper testified that she was also concerned because Charisse was vomiting blood, and a nasogastric tube was placed accordingly. Dr. Casper testified that Charisse's blood alcohol level was .282 at midnight, but that she had no sense that Charisse had trouble relating the events to her. Dr. Casper testified that the injuries which she observed were consistent with Charisse's story. Dr. Casper testified that the beating posed a significant risk because blood loss could cause serious and permanent injury. Charisse received four units of blood while in the hospital.

Harper also testified below. He stated that he allowed Charisse to live with him in order to keep her off of the streets. Harper denied any altercation regarding the telephone. He stated that he heard a noise and saw feet coming into the kitchen window, at which point he grabbed Charisse but let go once he realized who it was. Harper denied striking Charisse. Harper testified that he then left to go to the store. Harper testified that upon his return, the police were present. He spoke to them and was told to return home.

At the close of testimony, Harper's counsel moved for a directed verdict, which was denied. As noted, Harper was ultimately convicted of second-degree assault and first-degree unlawful imprisonment. He subsequently waived his right to a jury determination of sentencing and entered a guilty plea in exchange for an eight-year sentence on the assault charge and a five-year sentence on the unlawful imprisonment charge, with both sentences to run concurrently for a total of eight years. Harper was sentenced the same day.[3]

Although the trial proceedings were videotaped, the courtroom recording equipment failed to record any audio of the three-day trial. On September 18, 2009, Harper filed a "Motion for Judgment Notwithstanding the Verdict, or in the Alternative, Motion for New Trial," in which he raised a *Batson*[4] issue; a claim regarding a juror that counsel thought should have been stricken for cause; an alleged trial court error concerning a motion in limine, which the court sustained, regarding Harper's cocaine usage; and an alleged error for failure to grant a directed verdict in Harper's favor.

Approximately a month later, on October 23, 2009, Harper filed a "Supplement to Defendant's Motion for a New Trial," asserting that without an audio record, he would be unable to exercise his right to an

---

3. The Commonwealth asserts that Harper incorrectly states in his brief that he discovered that the courtroom equipment had failed to record any audio prior to final sentencing. The Commonwealth states that, in fact, Harper was sentenced on February 16, 2009, drafted his motion for a new trial on February 18, 2009—without the videotaped record— and filed a supplemental motion for a new trial on October 23, 2009, informing the court that the videotaped trial record contained no sound.

4. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

appeal. In making that motion, Harper acknowledged that Kentucky Rules of Civil Procedure (CR) 75.13 allows for the use of a narrative statement in the absence of a stenographic or electronic record but argued that "recourse to a narrative statement would serve only to compromise the right to appeal guaranteed under Kentucky's Constitution." Harper's motion was heard at final sentencing on October 30, 2009.

In the trial court's "Order Denying New Trial and Addressing Trial Record," the court stated that the failure of the audio equipment was "an endemic problem with the current, somewhat dated version of JAVS which is in use in Jefferson Circuit Court. Allegedly, subsequent versions have been modified to minimize or eliminate this problem." The court determined that an attempt had to be made to reconstruct a trial record by employing a narrative statement before the court could decide whether a new trial was necessary.

A narrative statement was prepared, with an opportunity for input from the parties, pursuant to CR 75.13 and using the notes of the trial judge. Harper asserts that, rather than following the sequence set out in CR 75.13 wherein Harper would first create a narrative statement and submit that statement to the Commonwealth and then ultimately to the court, the judge instead created a narrative based upon the judge's notes from trial. The "Trial Summary from Judge's Notes," was submitted to Harper and to the Commonwealth, and both filed responses to the proposed record. In responding to this request, Harper did not make any suggestions as to facts to be added or taken away from the statement but did reassert his opinion that the record, without audio recording, was insufficient.

Thereafter, a second hearing was held on April 1, 2010. Regarding Harper's request for a new trial, the court stated that it felt confident about the rulings it had made during trial and that it had not committed error. Further, the court found that the lack of an audio record was not an adequate ground upon which to grant a new trial. Accordingly, on August 10, 2010, the court entered an order officially denying the motion for new trial and ruling that the appeal would proceed based upon the reconstructed trial record. In that order, the trial court also addressed the remaining grounds that Harper asserted warranted a new trial.

Concerning the *Batson* challenge, the court noted that defense counsel had struck one of the two African American males on the jury and that the Commonwealth had stated a plausible, race-neutral reason for striking the other African American male juror. The court found that this reason had been established in the record and that it had no recollection of anyone else on the venire panel saying similar things as those jurors who were struck. Accordingly, the court found the *Batson* challenge insufficient. Concerning the argument that Dr. Casper should have been allowed to testify about a positive cocaine metabolite test of Charisse shortly after the incident in question, the court disagreed. Finally, concerning Harper's claim that a directed verdict should have been granted in his favor, the court again disagreed. It is from that order that Harper now appeals to this Court.

On appeal, Harper makes four arguments: (1) that the Commonwealth cannot meet its burden to demonstrate that the reconstructed record is adequate to afford Harper a full and fair review of his trial on appeal; (2) that Harper was entitled to a directed verdict of acquittal on the unlawful imprisonment first-degree and assault

second-degree charges because the Commonwealth failed to prove the existence of serious physical injury; (3) that the jury instructions deprived Harper of his state constitutional guarantee of a unanimous verdict and his federal constitutional right to a majority verdict because they permitted a conviction on theories not supported by the evidence; and (4) that the Commonwealth improperly exercised a preemptory challenge on the basis of race and, by doing so, violated the Equal Protection Clause.

■ Having reviewed the record and applicable law, we believe that resolution of this appeal ultimately turns upon the clear and unequivocal language of CR 75.13. That provision provides that:

(1) In the event no stenographic or electronic record of the evidence or proceedings at a hearing or trial was made or, if so, cannot be transcribed or are not clearly understandable from the tape or recording, the appellant may prepare a narrative statement thereof from the best available means, including his/her recollection, for use instead of a transcript or for use as a supplement to or in lieu of an insufficient electronic recording. This statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service upon him/her. Thereupon the statement, with the objections or proposed amendments, shall be submitted to the trial court for settlement and approval, and as settled and approved shall be included in the record on appeal.

(2) By agreement of the parties a narrative statement of all or any part of the evidence or other proceedings at a hearing or trial may be substituted for or used in lieu of a stenographic transcript or an electronic recording.

Our reading of this rule indicates that it was clearly created to provide a remedy for situations such as that which occurred *sub judice.* And, *sub judice,* it was Harper's decision not to avail himself of that remedy and, moreover, to refuse to participate in the trial court's attempt at same. As our Kentucky Supreme Court clearly held in *National Dairy Products Corp. v. Rittle,* 487 S.W.2d 894, 896 (Ky.1972), a litigant must follow the procedure of supplying a narrative statement, in the event of a deficiency, in order for a reviewing court to determine whether he has been prejudiced. *Id.* If a party does not avail himself of that remedy, the result is that "he arrives in this court without a record of what he claims to have been the evidence." *Id.* at 896–97.

■ Below, Harper failed to submit a narrative statement as required by CR 75.13. In his brief to this Court, Harper asserts that he did not initiate the record reconstruction process because the trial court decided to reconstruct the record by using its trial notes. While the record indicates that Harper objected to the trial court's preparation of the narrative statement, there is no indication that Harper attempted to assert his right to create the narrative statement on his own. This Court is of the opinion that Harper would certainly have the right to object to the adequacy of the narrative statement as a substitute for the record after it had been prepared with his participation. However, he cannot decline to prepare a statement himself and subsequently decline to participate in the court's preparation of such a statement and then argue on appeal the adequacy of the record.

■ As our Supreme Court recently stated in *Chestnut v. Commonwealth,* 250 S.W.3d 288, 303–04 (Ky.2008), "[I]t is the duty of a party attacking the sufficiency of the evidence to produce a record of the

proceedings and identify the trial court's error.... Failure to produce such a record precludes appellate review." While Harper is correct in asserting that, pursuant to *Cardine v. Commonwealth,* 623 S.W.2d 895, 896 (Ky.1981), the Commonwealth has the burden of demonstrating that the reconstructed record is adequate to afford the appellant the full and fair review that is constitutionally guaranteed, Harper must first, as clearly indicated by CR 75.13, participate in the actual reconstruction of the record. He cannot simply refuse to do so and then complain of an inadequate record upon appeal.

■ Ultimately, when the record is incomplete, we assume that the omitted record supports the decision of the trial court. *Commonwealth v. Thompson,* 697 S.W.2d 143, 145 (Ky.1985). In light of Harper's refusal to even attempt compliance with CR 75.13, we are left with a record that is, at best, incomplete. Accordingly, we are required to assume that the portions which have been omitted support the decision of the trial court. In so doing, we find it unnecessary to address the remaining issues on appeal and, as a result, decline to do so.

Wherefore, for the foregoing reasons, we hereby affirm the August 10, 2010, order of the Jefferson Circuit Court.

ALL CONCUR.